Walter KASE and the Kase Family Ltd. Partnership and All Others Similarly Situated, Plaintiff,

v.

SALOMON SMITH BARNEY, INC., Defendant.

No. CIV.A.H–00–3504.

United States District Court, S.D. Texas, Houston Division.

Aug. 22, 2003.

Thomas D. Cordell, Kenneth M. Krock, Haynes and Boone, L.L.P., Houston, TX, for defendant.

Melvyn I. Weiss, Ariana J. Tadler, Douglas J. Hoffman, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, David J. Sacks, Kathleen H. Boll, Sacks & Associates, Houston, TX, for plaintiff.

## ORDER

RAINEY, District Judge.

Pending before the Court is Plaintiffs Walter Kase's and the Kase Family Ltd. Partnership's (collectively "Kase") Motion for Class Certification (Dkt.# 114). On June 9 and 10, 2003, the Court held a class certification hearing at which both parties presented witnesses and evidence. After considering the parties' arguments and the applicable law, the Court is of the opinion that the pending motion should be denied. Also pending before the Court is Defendant Salomon Smith Barney, Inc.'s ("SSB") Motion to Exclude the Testimony of David Norcom (Dkt.# 119). In light of the Court's ruling on Kase's motion for class certification, this motion is denied as moot.

## FACTUAL BACKGROUND

Walter Kase opened a brokerage account with SSB in his capacity as general partner for the Kase Family Ltd. Partnership. Under the contract establishing this account, known as a Consulting and Evaluation Services ("CES") agreement, Kase paid a fee based on the value of his account. He did not pay fees for specific trades. Under the CES agreement, SSB was required to execute trades only in accordance with the instructions of Kase's Investment Manager ("IM"), Oppenheimer Capital ("Oppenheimer"). In order to ensure favorable tax treatment for Kase, Oppenheimer sometimes instructed SSB to sell specific lots of securities (for example, the stock with the highest basis in order to minimize capital gains or maximize capital losses). Trades of specific lots of a security are known as versus-purchase sales ("VSP"). SSB executed some VSP trades without any problems. However, in some cases Oppenheimer gave SSB incorrect VSP information or subsequently changed the VSP information it had originally provided to SSB. In other cases, instead of executing the trades on a VSP basis, SSB executed the trades on a first in/first out ("FIFO") basis causing Kase to suffer unfavorable tax consequences. Kase did not discover the problems with the VSP trades until he retired and had the time to compare his account statements from Oppenheimer with his statements from SSB. Kase repeatedly complained about the discrepancies in his account statements to both SSB and Oppenheimer. Although many of the trades involving incorrect VSP information were subsequently corrected, the problem continued to recur and was never fully remedied. Eventually Kase became so frustrated with SSB's apparent inability to correctly execute VSP trades that he closed his accounts with both SSB and Oppenheimer. A few other CES clients may have had problems similar to those experienced by Kase.

Kase's only remaining claim is for breach of contract. Kase has requested that his contract with SSB be rescinded and that he recover all of the fees he paid to both SSB and Oppenheimer. Kase has also sought to certify a class consisting of all SSB customers who executed CES agreements between October 6, 1996 to the present and whose accounts were not tax-exempt.

## CLASS CERTIFICATION STANDARD

A class action may be certified only if four prerequisites are satisfied:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV.P. 23(a); *see also Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir.2001). In addition, a plaintiff seeking to certify a Rule 23(b)(3) class action must also show that "the questions of law or fact common to the members of the class predominate over the questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV.P. 23(b)(3); *see also Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003) *cert. pet. pending* (citing *Patterson v. Mobil Oil Corp.*, 241 F.3d 417, 418–19 (5th Cir.2001)). The Fifth Circuit has also held that:

It is important to remember that the class action device exists primarily, if not solely, to achieve a measure of judicial economy, which benefits the parties as well as the entire judicial system. It preserves the resources of both the courts and the parties by permitting issues affecting all class members to be litigated in an efficient, expedited, and manageable fashion.

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 410 (5th Cir.1998).

■■■ The party seeking class certification bears the burden of proving that class certification is appropriate. *Berger*, 257 F.3d at 479 n. 4. Unsupported allegations that the case satisfies the requirements of Rule 23 are an insufficient basis for certifying a class action. *See Fleming v. Travenol Labs., Inc.*, 707 F.2d 829, 833 (5th Cir.1983). However, the party seeking class certification may rely on reasonable, common-sense assumptions and inferences to satisfy the requirements for class certification. *See Zeidman v. J. R. McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir.1981).

The court has a duty to "rigorously analyze Rule 23's prerequisites before certifying a class." *Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 310 (5th Cir.2000). In order to ensure that the requirements of Rule 23 have been satisfied, the court should look beyond the pleadings in order to " 'understand the claims, defenses, relevant facts, and applicable substantive law.' " *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir.2003) (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir.1996)); *see also Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n. 12, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) (" 'Evaluation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims.' " (quoting C. WRIGHT,

A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3911 (1976))).

## ANALYSIS

### I. Rule 23(a) Requirements

#### A. Numerosity

■ In order to show numerosity, "a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members."[1] *Zeidman*, 651 F.2d at 1038. However, the plaintiff need not prove the exact number of putative class members. *See Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000). To support his claim that the number of potential class members is so great as to make joinder unfeasible Kase relies primarily on the testimony of David Norcom, a former SSB employee who handled Kase's account at SSB. According to Norcom, SSB had at least a million CES clients across the United States. *See* Dep. of David Norcom at p. 39, ll. 16–25. Of these, approximately half were not tax-exempt and could potentially have been adversely affected by a failure to properly execute VSP trades. *Id.* at p. 43, l. 23 to p. 44, l. 4. Norcom was also personally aware of a few other CES clients besides Kase who had experienced problems with their VSP trades. 2 Tr. of Class Certification Hr'g at p. 137, l. 24 to p. 136, l. 3; p. 141, l. 25 to p. 142, l. 2; p. 163, ll. 19–23 [hereinafter Tr.]. However, only about 20% of Norcom's CES clients who had accounts that were not tax-exempt had problems similar to Kase's.[2] *See id.* at p. 142, ll. 13–17; p. 163, ll. 19–23. Norcom also suggested that the problem with executing VSP trades correctly was endemic at SSB and was the result of a problem with SSB's computer system. Specifically, Norcom stated that "on occasion" SSB did not execute tax-sensitive trades re-

---

1. Raw numbers are not the only factor relevant to the numerosity requirement. For example, "the geographical dispersion of the class, the case with which class members may be identified, the nature of the action, and the size of each plaintiff's claim" are also relevant considerations in the numerosity analysis. *Zeidman*, 651 F.2d at 1038.

2. Norman Nabhan, a national director of SSB's Consulting Group, testified that during the class period VSP trades were relatively uncommon. *Id.* at p. 179, l. 19 to p. 181, l. 4. Of course, Nabhan attributed this to the fact that most CES accounts were held by foundations, endowments, and pension funds and were tax-exempt. *Id.* at p. 181, ll. 2–4. These accounts are already excluded from the class definition.

liably, *id.* at p. 137, ll. 16–18, "I don't know how pervasive the problem was, but I know that there were numerous problems," *id.* at p. 166, ll. 17–18, and although SSB sometimes executed tax-sensitive trades correctly there were many instances in which it did not. *Id.* at p. 167, ll. 9–23. Norcom did not have personal knowledge of any accounts other than the ones he managed.[3] Kase also points to a form e-mail SSB used to correct VSP trades arguing that this allows an inference that SSB routinely made errors executing VSP trades.

■ SSB notes that despite having almost two and a half years to conduct discovery Kase has failed to uncover a single other putative class member. The Court permitted Kase to send contact letters and questionnaires to 100 CES clients from a list of 500 provided by SSB. Kase did not receive a positive response to any of those questionnaires or letters.[4] Kase also sent a contact letter and questionnaire to another potential class member identified by Norcom, C. Brice DeGanahl, but DeGanahl did not respond to the questionnaire Kase sent him.[5] In addition, SSB has asserted that it is not aware of any other CES clients who had problems similar to Kase's. Aff. of Dana Fowler at p. 2.

In *Pederson*, the plaintiff sought to certify a class consisting of past and future female LSU students who wanted to participate in intercollegiate sports but were unable to do so because LSU did not field women's teams in some sports for which it did field men's teams. *Pederson*, 213 F.3d at 865. The Fifth Circuit held that because the plaintiffs had produced evidence that there was a large pool of talented female athletes in Louisiana, and that most LSU students came from Louisiana, the plaintiffs had established that there would probably be a large number of future female LSU students who would want to participate in varsity sports at LSU. *Id.* at 868. However, Norcom's testimony regarding the handful of accounts he personally handled simply does not support Kase's claim that SSB had a systemic problem executing VSP trades and thus that the putative class is so numerous that joinder is impracticable. Only a small fraction of the accounts Norcom handled had problems similar to Kase's. Norcom himself acknowledged that sometimes VSP trades were executed correctly and that he did not know the extent of the problem. His opinion that the problem was widespread appears to be nothing more than speculation, not the reasonable estimate required to establish numerosity. Of course, the possibility that some class members may not have valid claims against SSB does not defeat class certification. *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 624 n. 1 (5th Cir.1999). However, in the present

---

**3.** The Court also notes that Norcom left SSB under circumstances that were less than friendly and that he can hardly be described as an unbiased witness. Apparently Norcom had been the subject of two sexual harassment claims while at SSB and his superiors had warned him that if such behavior was repeated he would be fired. *Id.* at p. 151, l. 14 to p. 153, l. 9. In addition, a significant error occurred in one of the accounts Norcom managed. *Id.* at p. 154, ll. 2–4. Although Norcom blamed the error on Brenda Richardson, one of SSB's witnesses at the class certification hearing, Norcom paid for the mistake out of his own pocket. *Id.* at p. 154, l. 5 to p. 155, l. 21. Finally, when Norcom left SSB, SSB withheld his final paycheck and other benefits to which Norcom was entitled. *Id.* at p. 144, ll. 3–14. At that time Norcom was also involved in a bitter divorce and was caring for his twelve-year old son. *Id.* at p. 144, ll. 15–24. Norcom testified that the ensuing litigation was very stressful and that he did not feel that SSB had treated him fairly. *Id.* at p. 149, l. 24 to p. 151, l. 13.

**4.** Two of the questionnaires were returned with responses marked "N/A." Kase argues that these N/A responses permit an inference in favor of Kase. Such an inference is permissible only if one does not understand the meaning of the abbreviation "N/A." In addition, both of these questionnaires contain negative responses that preclude any possibility of reading these questionnaires in a manner that supports Kase's position on class certification.

Kase is correct that 100 people is much too small a sample size from which to draw any definite conclusions. However, the burden of proof at the class certification stage is on Kase. The absence of solid information is as fatal to Kase's attempts to certify a class as is any contradictory evidence submitted by SSB.

**5.** Kase has argued that he cannot be sure that DeGanahl received the contact letter and questionnaire. Of course, Kase could have prevented this uncertainty by sending the contact information CMRRR.

case the evidence indicates that it is likely that the majority, and not just some, of the potential class members will not have valid claims against SSB. In addition, there is no evidence of a class "linked by a common complaint" because there is no evidence of a significant number of other individuals with complaints similar to Kase's or of a common course of action by SSB. *Id.* The possibility that the class of potential plaintiffs might be so large that joinder would be impracticable is not the same as proof of such numerosity. Unlike *Pederson,* the evidence presented in this case cannot support a reasonable inference that there is a large number of prospective class members.

The pre-formatted e-mail does not support such an inference either. First, when dealing with a company the size of SSB the fact that a problem occurs frequently does not indicate a systemic problem because the recurrence of the same problem is equally attributable to statistical probability. *See* 2 Tr. at p. 212, ll. 3–8. Second, the preformatted e-mail was used to correct problems in non-CES accounts as well as CES accounts limiting its evidentiary value in respect to the proposed class action. *Id.* at p. 211, l. 19 to p. 212, l. 2. Third, the preformatted e-mail was used to correct any problem with a VSP trade, not just errors attributable to SSB. *Id.* at p. 212, ll. 9–16. In fact, several of the discrepancies about which Kase complained occurred because Oppenheimer sent SSB incorrect VSP information or subsequently changed the information it sent. *Id.* at p. 204, l. 24 to p. 210, l. 13. In those cases, SSB executed Oppenheimer's instructions properly and any resultant error was not the responsibility of SSB. The existence of a preformatted e-mail to correct erroneous VSP information is just as consistent with the routine commission of errors by the various IMs used by the CES clients as it is with problems at SSB.

Further, while it is true that numerosity is not determined based on the number of potential class members who have actually come forward with complaints, *see Hewlett v. Premier Salons Int'l, Inc.,* 185 F.R.D. 211, 216 (D.Md.1997), the Court finds it remarka-

ble that Kase has been unable to identify any other potential class members, with the possible exception of DeGanahl. It is true that the errors alleged by Kase would not necessarily be readily apparent to the potential class members. *See* 2 Tr. at p. 142, l. 23 to p. 143, l. 11. Nevertheless each individual class member's claim appears to involve substantial sums of money. It is difficult to accept the proposition that all of the thousands of CES clients who would be included in the class Kase seeks to certify are so lackadaisical about their financial affairs that Walter Kase is the only person to have discovered the allegedly widespread problems in SSB's accounting procedures. This is especially true in light of the fact that many of the potential class members are sophisticated consumers of financial services. Although not dispositive, it is difficult to account for the almost total absence of evidence of other similarly situated claimants except by inferring that there are no similarly situated claimants.

Kase has requested more time to conduct discovery to ascertain the number and identity of other potential class members. In *Zeidman,* the court did permit the plaintiffs the opportunity to submit additional evidence to support numerosity after the court initially refused to certify the class. However, Kase has had over two years to locate other class members and contrary to Kase's assertion, the Court has not impeded his ability to conduct discovery on this issue. On July 22, 2002, the Court approved a protective order preventing Kase from contacting SSB's customers without leave of the Court. Kase sought such leave in only two instances, first, to send a contact letter to 100 randomly selected CES clients, and second to depose DeGanahl. Because Kase's proposed contact letter was misleading in several important respects, the Court did not approve the letter Kase wanted to send to the 100 putative class members. However, the Court did approve a compromise form letter and questionnaire on which both parties provided input. The Court also permitted Kase to contact DeGanahl through the same contact letter, although it did not allow Kase to depose him.[6]

---

**6.** The Court also notes that Norcom testified that

DeGanahl was "[n]ext to impossible" to contact,

Kase has never asked, for example, for permission to attempt to solicit potential class members through the mass media. Advertisements on television, radio, and in newspapers are frequently used by plaintiffs' attorneys to located potential clients and this method · would, if the putative class is as numerous as Kase suggests, likely have yielded positive results.[7] Nor was Kase limited to evidence obtained directly from other potential class members in order to establish numerosity. Notably absent from Kase's evidence is any mention of other pending lawsuits against SSB involving claims similar to Kase's. The pendency of numerous, similar lawsuits is a fact often given great weight in supporting a decision to certify a class action.

In addition, the supplemental evidence the plaintiffs in *Zeidman* needed to support their numerosity claim "rested on published and easily accessible stock exchange data." *Zeidman*, 651 F.2d at 1038. The documents Kase has previously requested in connection with his numerosity claim consist of contact information for all of SSB's customers who had CES accounts during the class period. As the Court noted in its July 12, 2002 order, this information could only be produced at great expense to SSB and Kase is not entitled to these materials. Kase has had an adequate opportunity to obtain information supporting his class claims but has failed to produce sufficient evidence of numerosity. If Kase has not conducted sufficient discovery in this case, the responsibility for this oversight is solely his.

## B. Commonality

■ Commonality is not difficult to prove and only requires a showing that " 'there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.' " *Mullen*, 186 F.3d at 625 (quoting *Lightbourn v. County of El* *Paso*, 118 F.3d at 421, 426 (5th Cir.1997)). Rule 23(a)'s commonality requirement is aimed at " 'determining whether there is a need for combined treatment and a benefit to be derived therefrom.' " *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir.1986) (quoting *In re Agent Orange Prod. Liab. Litig.*, 506 F.Supp. 762, 787 (E.D.N.Y. 1980)). Thus, "[i]t is not every common question that will suffice . . . . What we are looking for is a common issue the resolution of which will advance the litigation." *Sprague v. GMC*, 133 F.3d 388, 397 (6th Cir.1998). Kase has identified six issues which he contends are common to the individual claims of a significant number of the putative class members.

■ First, "whether SSB committed to account for and follow instructions of the [IMs] on its CES accounts." Pls.' Mot. for Class Certification at 12 [hereinafter Class Cert. Mot.]. An action primarily involving interpretation of a form contract is well suited for class adjudication, at least on the issue of liability. *See Durrett v. John Deere Co.*, 150 F.R.D. 555, 558 (N.D.Tex.1993). However, in the present case, there appears to be no dispute regarding the interpretation of the CES agreement. The plain language of the CES agreement obligates SSB to execute trades in accordance with the instructions from the CES clients' IMs. In fact, in its motion for reconsideration of the Court's September 24, 2000 order denying its motion to dismiss, SSB argued that because Kase had a nondiscretionary account, SSB's only duty was to "execute the trades pursuant to the client's instructions." Def.'s Mot. for Recons. & Supplemental Mot. to Dismiss Pls.' Second Am. Class Action Compl. at 4; *see also id.* at 5 ("Pursuant to the Consulting Group Agreement . . . between Plaintiffs and SSB, SSB was to provide execution services

*id.* at p. 140, ll. 16–18, and that Kase suggested that he was unsure of the accuracy of his contact information for DeGanahl. Thus, it is doubtful that Kase would have been able to depose DeGanahl even if he had been given the opportunity to do so.

**7.** As the Court noted in its April 29, 2002 order, the protective order was entered in response to Kase's request for contact information for all of

SSB's customers who had CES accounts during the class period. As the Court has repeatedly pointed out, the Court's primary concern in restricting Kase's access to SSB's customers was that the privacy of the potential class members not be disturbed by unwanted calls or mailings from counsel for Kase. Soliciting potential class members through publication or advertising would not have presented this problem.

on purchases and sales determined by Plaintiffs' [IM], Oppenheimer.").

Second, "whether SSB's accounting department was capable of executing transactions other than on a [FIFO] basis." Class Cert. Mot. at 12. Once again this issue does not appear to be in dispute. There is no evidence that SSB was incapable of performing VSP trades. Norcom stated explicitly that SSB had the ability to execute VSP trades, 2 Tr. at p. 137, ll. 13–15; *see also id.* at p. 167, ll. 9–23, and Walter Kase testified that SSB did perform at least some VSP trades in his account correctly.[8] 1 Tr. at p. 105, ll. 6–8. Thus, SSB was capable of performing VSP trades even if it sometimes failed to do so properly.

Third, "whether SSB maintained a policy and practice of ignoring and/or, with some level of frequency, did ignore, instructions from CES [IMs] which directed SSB to execute transactions other than on a [FIFO] basis." Class Cert. Mot. at 12. This claim is central to the viability of Kase's class claims. However, the importance of this issue to the claims of the individual class members is far less certain. Individual CES clients would not need to prove that SSB routinely ignored VSP instructions in order to prove their cases. Perhaps more significantly, proof that SSB did routinely violate VSP instructions would be insufficient, by itself, to permit any individual class member to prevail on the merits. In addition, it is doubtful that this evidence would even be admissible in individual trials. Its only relevance on the individual class members' claims appears to be to show that SSB acted in conformity with other bad acts in handling a particular CES account.[9] *See* FED. R. EVID. 404. Even if evidence of SSB's allegedly widespread negligence in executing VSP trades was admissible, if the claims of the class members were dealt with individually, it is likely that many potential class members would avoid the issue altogether preferring to focus solely on their own accounts.[10] In light of the tenuous relevance of SSB's allegedly programmatic failure to execute VSP trades correctly to the essential elements of the claims of the individual class members, the Court cannot conclude that resolution of this issue will affect a significant number of the putative class members.[11]

Fourth, "whether SSB, in accordance with the CES agreements, followed all instructions of the [IMs]." Class Cert. Mot. at 12. Answering this question will require comparing the trades SSB made on each CES account to the instructions given to SSB by that particular CES client's IM. This is the only way to determine whether or not SSB actually followed the instructions it was given regarding any given CES account. It is difficult to imagine an issue more unsuited for class treatment.

8. In light of this evidence, it is doubtful that Kase could even raise this argument in good faith at trial.

9. Because Kase's only remaining cause of action is for breach of contract, not fraud or negligence, issues such as intent and lack of accident or mistake are irrelevant to this lawsuit.

10. This conclusion would be different if this was, for example, a civil rights or employment discrimination case in which Kase was seeking to redress an unconstitutional or discriminatory policy. However, Kase's claim, and the claims of the individual class members, are not premised on the existence of a policy at SSB that affects them as a discrete class with legally protected interests. In fact, the issue of a systematic failure on the part of SSB to properly execute VSP trades would appear to have primary relevance in a third-party action brought by SSB against the IMs as a defense asserted by the IMs.

11. In addition, most cases certifying class actions outside of the employment discrimination and civil rights contexts have involved common issues dispositive of one of the elements of the class members' causes of action. *See e.g., Mullen,* 186 F.3d at 625 (certifying a class involving common issues relating to the class members' status as Jones Act seamen and the unseaworthiness of the vessel on which they worked); *Jenkins,* 782 F.2d at 471 & n. 3 (involving common issues in an asbestos class action relating to product identification, the state of the art defense, and the defendants' knowledge of the dangers of their products); *Henry v. Cash Today, Inc.,* 199 F.R.D. 566, 571–72 (S.D.Tex.2000) (finding that there was a common issue of law as to whether the defendant's business practices constituted loans at usurious rates under the governing statutes). Obviously dispositive issues affecting essential elements of the class members' causes of action and involving the same operative facts will be common to all of the class members.

Fifth, "whether class members incurred damages as a result of SSB's failure to follow the instructions of the [IMs]." *Id.* The purpose of making trades on a VSP basis is to minimize the investor's tax liability. Thus, to determine whether a particular CES client suffered damages because of SSB's failure to properly execute VSP trades will necessitate examining that CES client's tax returns for every year within the class period. Like the previous issue, the issue of damages in this case is not well suited for class treatment.

Sixth, "the extent of damage sustained by Class members and whether the appropriate measure of damages is recovery of the fees paid by Class members to SSB and their designated [IMs] under the CES agreement." *Id.* Assuming the rather dubious proposition that Kase and the other putative class members have a colorable rescission claim, resolution of this issue will also require a detailed analysis of the facts surrounding each individual class member's claim. In order to be entitled to rescission, it must be possible to restore the parties, as nearly as possible, to the positions they were in before entering into the contract. *See In re Ivan F. Boesky Sec. Litig.,* 825 F.Supp. 623, 637 (S.D.N.Y.1993). Normally this entitles the defendant to an offset for any benefits actually conferred on the plaintiff pursuant to the contract. In the present case, there is no dispute that SSB handled all of the Kase's purchase orders correctly. 1 Tr. at p. 104, ll. 18–20. In addition, SSB handled most of Kase's sell orders correctly. *Id.* at p. 104, l. 23 to p. 105, l. 8. In fact, as few as eight transactions may be at issue in this lawsuit.[12] *See* Pls.' Resp. to Def.'s First Set of Interrogs. at Resp. 2. Thus, even if Kase is entitled to rescind his contract with SSB, it appears that SSB would be entitled to a substantial setoff for the services it provided to Kase and the other CES clients. The value of these services will vary significantly between the individual class members and thus the amount of each putative class mem-

ber's damages cannot be determined on a class wide basis even under a rescission theory. Kase has not met his burden of proving that there are common issues of law or fact affecting a significant number of the putative class members the resolution of which will advance this litigation.

## C. Typicality

Typicality, " 'focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent.' " *Mullen,* 186 F.3d at 625 (quoting *Lightbourn v. County of El Paso,* 118 F.3d at 421, 426 (5th Cir.1997)). Class representatives must have " 'the same interest and suffer the same injury' " as all other members of the class, *Anderson v. Kutak, Rock & Campbell,* 51 F.3d 518, 522 (5th Cir.1995) (quoting *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974)), although this does not mean that the claims of the putative class members must be absolutely identical. *Piazza v. Ebsco Indus., Inc.,* 273 F.3d 1341, 1351 (11th Cir.2001). It is sufficient that " 'the named representatives' claims share the same essential characteristics as the claims of the class at large.' " *Id.* (citing *Prado–Steiman v. Bush,* 221 F.3d 1266, 1279 n. 14 (11th Cir.2000)).

Of course, it is difficult, if not impossible, to determine whether Kase's claims are typical of those of the other class members in the absence of any other class members against which to compare his claims. Although it is possible that there are CES clients with claims similar to Kase's, there is no evidence relating to the facts surrounding their hypothetical claims. Thus, it would be pure speculation to conclude that Kase's claims are typical of those available to other CES clients.

In any event, there are two other important respects in which Kase's claims appear to differ from those that might be brought by

---

**12.** Kase appears to contend that many more trades are actually in dispute. *See id.* at p. 83, ll. 11–15. However, it appears that SSB corrected many of the incorrect VSP trades after Kase complained. Although the Court is not unsympathetic to the frustration Kase undoubtedly suf-

fered during his dealings with the corporate bureaucracies at Oppenheimer and SSB, he may not recover for errors which SSB corrected and which did not cause him to suffer any economic damages.

other potential class members. First, Kase has not brought suit against his IM. SSB has consistently blamed most of the VSP errors about which Kase complained on Oppenheimer. The reason for Kase's unwillingness to bring suit against Oppenheimer is unclear, especially because Kase himself has acknowledged that he does not know whether Oppenheimer or SSB was responsible for the discrepancies in his account statements. 1 Tr. at p. 95, l. 1 to p. 98, l. 3. This inexplicable omission, which allows SSB to blame the empty chair, appears to be an unusual way to approach the liability phase of this litigation.

■ Second, Kase has elected to pursue rescission on behalf of the class instead of seeking recovery for the excess tax liability he was exposed to as a result of SSB's failure to follow Oppenheimer's instructions. However, it is very doubtful that either Kase or any of the other potential class members will be able to recover on a rescission theory. Under New York law, which governs this suit under the CES agreement's choice of law provision,

> before rescission will be permitted the breach must be material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract. As an extraordinary remedy, rescission is appropriate only when a breach may be said to go to the root of the agreement between the parties.

*Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2nd Cir.1989) (internal quotations and citations omitted). Rescission is not available when the plaintiff has received a substantial benefit from the contract. *See Canfield v. Reynolds*, 631 F.2d 169, 178 (2nd Cir.1980) (holding that an investor was not entitled to rescind a stock purchase agreement even though the seller breached the agreement by failing to register the stock for public sale because by purchasing the stock the investor had an opportunity to profit from his investment even if he could not easily resell the stock); *Nolan v. Sam Fox Publ'g Co.*, 499 F.2d 1394, 1398–99 (2nd Cir.1974) (holding that a composer was not entitled to rescission even though he had not been paid 74% of the royalties to which he

was entitled). In the present case, SSB's primary responsibility under the CES agreement was to execute trades at Oppenheimer's direction, which SSB did correctly most of the time. Kase's claim for rescission is so weak that it borders on the frivolous and therefore, it is extremely unlikely that rescission is a remedy that other class members would be likely to pursue. Kase has not proven that his claims share the same essential characteristics as those of the other class members.

### D. Adequacy

**1. Adequacy of Class Counsel.** Rule 23(a)'s adequacy requirement has two components, the adequacy of class counsel and the adequacy of the class representatives. *Berger*, 257 F.3d at 479. In addition, "[t]he adequacy inquiry also 'serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent.'" *Id.* at 479–480 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). In the present case, SSB has not challenged the adequacy of class counsel, Milberg, Weiss, Bershad, Hynes & Lerach, L.L.P. ("Milberg Weiss"). Milberg Weiss is a large law firm with substantial experience in securities class action litigation. Milberg Weiss is well qualified to represent the proposed class.

**2. Adequacy of the Class Representative.** Walter Kase was born in Lodz, Poland in 1929. As a young man he spent five years as a slave laborer in five Nazi concentration camps and a ghetto. He emigrated to the United States in 1947. Speaking almost no English, Walter Kase worked his way through high school with the assistance of a German to English and a Polish to English dictionary. He served in the United States army for two years after which he worked for a costume jewelry company in Houston, Texas. Eventually he founded his own business which he sold in 1990. Walter Kase is actively involved in community affairs and has received the St. Augustine Award from St. Thomas University. *See generally* 1 Tr. at p. 73, l. 4 to p. 77, l. 4.

There can be no doubt as to Walter Kase's ability and integrity. The Court will not

belabor this point as there is nothing the Court can add to the evidence provided by Walter Kase's history and accomplishments.

 Walter Kase understands the nature of this lawsuit and his claims against SSB. *See id.* at p. 86, ll. 8–12. However, Walter Kase also testified that he has not participated in many of the key strategic decisions that have been made in this case. *See id.* at p. 107, l. 8 to p. 109, l. 25. He also stated that he would permit class counsel to pursue this lawsuit as they saw fit. *Id.* at p. 109, ll. 6–8. The Fifth Circuit has held that, "[t]he adequacy requirement mandates an inquiry into ... the willingness and ability of the representative to take an active role in and control the litigation and to protect the interests of absentees." *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir.1982). Although a class representative may, and should, rely on the professional judgment of qualified class counsel, Walter Kase has not shown an inclination to take the active role in monitoring class counsel's activities that is required of a class representative. In addition, because a class representative with atypical claims may not be inclined to pursue the claims of the absent class members, the adequacy and typicality requirements overlap. *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 n. 7 (5th Cir.2002). As previously discussed, Kase's rescission claim appears to be an unusual remedy election which ignores other available forms of damages and suggests that Walter Kase may not be an appropriate class representative.[13] Kase has not satisfied any of the requirements of Rule 23(a).

## II. Rule 23(b)(3) Requirements

### A. Predominance

 Predominance is a more exacting requirement than commonality. *O'Sullivan,*

319 F.3d at 742. Thus, even if the Court were to conclude that Kase has satisfied the commonality requirement of Rule 23(a), the issues of law and fact which Kase asserts are common to the class are overshadowed by the existence of many individualized issues relating to both liability and damages. In order to establish liability, each putative class member would need to show that his IM sent VSP instructions to SSB and that SSB failed to follow those instructions. This inquiry would necessitate a review of the instructions given to SSB by each IM on each putative class member's account and a comparison of those instructions against the trades actually executed by SSB. This is the crux of the class members' claims and it involves factual determinations that cannot be made on a generalized or class basis. When liability can only be established by making individual evaluations of particular transactions, "not by presuming fire when there is smoke," class certification is improper. *Id.*

SSB has also asserted that the majority of the errors about which Kase complains were the result of faulty or inconsistent information SSB received from Oppenheimer. Thus, it appears that the policies, decisions, investment strategies, and instructions of over two-hundred independent IMs could be involved in this case if it were to proceed as a class action. 2 Tr. at p. 177, ll. 11–13. The facts pertinent to each IM would likely be relevant to only a small percentage of the putative class members. Thus, SSB's defenses would also create a horde of factual questions not applicable to the class as a whole.[14]

In addition, as previously discussed, assuming that the CES clients are entitled to rescind their contracts with SSB, SSB would be entitled to a set-off for the value of the services it actually performed for each client. This will require an individual assessment of

---

13. SSB also argues that Walter Kase does not have standing in his individual capacity to bring this lawsuit because he did not have an individual CES account with SSB. A plaintiff must have standing in order to serve as a class representative. *Johnson v. Bd. of Regents*, 263 F.3d 1234, 1268 (11th Cir.2001). However, there is no dispute that Walter Kase has standing in his capacity as general partner for the Kase Family Ltd. Partnership.

14. Conceivably this problem could be redressed through the use of subclasses. However, this solution raises its own difficulties. First, the presence of so many subclasses would severely undermine any advantage in terms of efficiency that might be garnered by certifying the class. Second, each subclass would need its own class representative and no likely candidates appear to be readily available.

the number of VSP trades SSB failed to perform correctly compared to the number of trades it performed properly. This would necessitate a detailed review and analysis of each class member's account information. This determination goes to the heart of Kase's damages claim, and, as with the liability issues in this case, it cannot be determined on a class-wide basis.

Kase has suggested that many of the individual liability and damages issues in this case will not involve significant factual disputes and can be resolved by consulting readily available documents and by deciding on a formula for calculating damages. However, courts have been "hesitant to rely on a formulaic nostrum given the consequences if it fails to meet expectations." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 191 (3rd Cir.2001). In the present case, Kase has offered no specifics for how such a formula would be calculated and the mere supposition that a formulaic damages model could be achieved is insufficient to support class certification. The individual issues involved in each of the class member's claims overwhelm whatever common issues Kase may have raised.

**B. Superiority**

 The focus of the superiority requirement is on the efficiency to be gained by proceeding on a class basis and the potential problems of managing the class once it is certified. *See Mullen,* 186 F.3d at 627. Even assuming that the individual liability and damages issues involved in this case could be resolved relatively simply, manageability problems would still abound. If the putative class is as large as Kase suggests, it is likely that hundreds of thousands, if not millions, of pages of documents would need to be reviewed in order to establish the value of the class members' individual claims. This would be a vast undertaking even for a special master. Such "[i]ndividual questions of economic loss present insurmountable man-

ageability problems." *Newton,* 259 F.3d at 192.

In addition, obtaining and reviewing discovery from the individual IMs would be both expensive and time consuming, even though most of the information obtained from each IM would be relevant to the claims of only a relatively small number of class members. This undercuts any claim that proceeding on a class basis will be anymore efficient than allowing the putative class members to pursue their claims individually.

The Court also notes that if Walter Kase should become unable to fulfill his obligations as class representative, there are no alternative class representatives available to take his place.[15] If such a scenario were to develop, the Court would be obliged to stay proceedings in the case in order to give Milberg Weis the opportunity to locate a suitable replacement class representative, a search which could, based upon Kase's experiences so far, prove to be fruitless. If Milberg Weiss was unable to locate a new class representative, the class action would have to be abandoned wasting all of the time, expense, and effort expended on the class action proceedings.

Finally, "the 'most compelling rationale for finding superiority in a class action-the existence of a negative value suit,' is missing in this case." *Allison,* 151 F.3d at 420 (quoting *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 748 (5th Cir.1996)). According to Kase, the claims of the individual class members appear to be worth tens of thousands of dollars each. In addition, most CES clients are sophisticated business people with ready access to high-quality legal representation. If there are other CES clients who have claims similar to Kase's, there is no reason to believe that they are incapable of asserting their legal rights. Kase has failed to satisfy either the superiority or the predominance requirements of Rule 23(b)(3).[16]

---

**15.** This is always a concern when only a single class representative is involved in litigation which will likely be protracted. In the present case, despite his apparently sound health, Walter Kase is also seventy-seven years old.

**16.** Assuming that there are other CES clients with complaints similar to Kase's, this case might have been well-suited for multi-district litigation. However, the arbitration provision in the CES agreement appears to foreclose this procedural vehicle.

## CONCLUSION

Kase has failed to meet his burden of proof on any of the Rule 23(a) and 23(b)(3) requirements for class certification. Therefore, Kase's Motion for Class Certification is DENIED. SSB's Motion to Exclude the Testimony of David Norcom is DENIED as moot.

It is so ORDERED.