**George LEHOCKY, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**TIDEL TECHNOLOGIES, INC., James T. Rash, Mark K. Levenick, James L. Britton III, and Jerrell G. Clay, Defendants.**

**No. CIV.A. H–01–3741.**

United States District Court, S.D. Texas, Houston Division.

March 30, 2004.

---

Roger Claxton, Claxton & Hill, PLLC, Dallas, TX, Joel Laitman, Schoengold & Sporn, PC, New York City, for Plaintiff—

George Lehocky, on behalf of himself and all others similarly situated.

Paul Bessette, Michael Biles, Jennifer Brannen, Akin, Gump, Strauss, Hauer & Feld, LLP, Austin, TX, for Defendants—Tidel Technologies, Inc., James T. Rash, Mark K. Levenick, James L. Britton, III, and Jerrell G. Clay.

## ORDER

HITTNER, District Judge.

Pending before the Court is Lead Plaintiffs' Motion for Class Certification filed by Robert Scott Stauffer, the Robert Scott Stauffer IRA Trust, and the Jerry Keeler Revocable Trust. Having considered the motion, submissions, and applicable law, together with the evidence and arguments of counsel presented at a class certification hearing conducted November 5–7, 2003, the Court determines that the motion for class certification should be granted.

## I. *Background*

On October 31, 2001, the first of five class actions arising out of the same set of operative facts and alleging violations of the securities laws against Tidel Technologies, Inc. ("Tidel") and many of the individual Defendants was filed. Accordingly, counsel published the required notice to class members on November 9, 2001, advising the public of the pendency of a class action. Subsequently, on March 13, 2002, the Court consolidated the related actions and appointed Lead Plaintiffs Robert Scott Stauffer, Robert Scott Stauffer IRA Trust, and the Jerry Keeler Revocable Trust (collectively, "Lead Plaintiffs" or "Plaintiffs") and Lead Counsel. Lead Plaintiffs then filed a consolidated class action complaint on April 10, 2002 [1] and the instant motion for class certification on June 9, 2003. Further, on October 20, 2003, with leave of court, Lead Plaintiffs filed a second consolidated amended complaint.

In their second consolidated amended complaint, Plaintiffs allege that Tidel is a manufacturer of automated teller machines ("ATM") and primarily sold to one major customer, Credit Card Center, Inc. ("CCC"). The instant lawsuit asserts that Tidel and its directors acted in concert to drive Tidel's common stock price up over 300% in six months by amplifying Tidel's financial condition, its business relationship with CCC, and the anticipation of its Internet enabled ATM machine, the Chameleon.[2] In addition, Plaintiffs allege that the individual Defendants profited personally from the artificial inflation of Tidel's stock price by selling in excess of $9.88 million of their Tidel shares during the six week period between June 5 and July 24, 2000, when Tidel's common stock price traded between $10.00 and $12.00 per share.[3] Plaintiffs also assert that Defendants issued materially false and misleading statements regarding Tidel's sales, revenues, and business model throughout the class period, January 14, 2000 through February 8, 2001. Plaintiffs allege these acts are materially false and misleading because Defendants knew the Chameleon ATM machines were poorly performing, overpriced, and unsaleable prototypes. Consequently, Plaintiffs argue that, due to performance dissatisfaction, Tidel's largest customer, CCC, replaced Tidel as its principal supplier. Plaintiffs allege that Defendants concealed the loss of its largest customer by failing to disclose that CCC entered into an agreement with Tidel's principal competitor, NCR Corporation ("NCR"), to become CCC's primary supplier of ATM machines.

Subsequent to the individual Defendants' sale of stock, Plaintiffs assert Tidel requested CCC place substantial orders of ATM machines during the third quarter of 2000. Plaintiffs argue that Defendants urged CCC to place the order because it would facilitate Tidel's obtaining $15 million in financing in September 2000 and delay the announcement of Tidel's diminished financial results as a result of the loss of CCC's business. Howev-

---

**1.** Defendants filed a motion to dismiss on May 10, 2002, which was denied.

**2.** Plaintiffs assert that the Defendants drove the stock price up from $2.75 per share in January

2000 to between $10.00 and $12.00 in June and July 2000.

**3.** These sales represented over 30% of the individual Defendants' Tidel holdings.

er, Tidel ultimately reported its financial results for the quarter ending December 31, 2000, which reflected the loss of CCC business to NCR, and Tidel's common stock price dropped to $2.90625 per share.

As a result of this activity, Plaintiffs assert that both Tidel Technologies, Inc. and the individual Defendants, James T. Rash, Mark K. Levenick, James L. Britton, III, and Jerrell G. Clay, violated section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities and Exchange Commission ("SEC").[4] Plaintiffs assert two additional claims against the individual Defendants, Rash, Levenick, Britton, and Clay: (1) violation of section 20(a) of the Exchange Act[5] and (2) violation of section 20A of the Exchange Act.[6]

## II. Plaintiffs' Proposed Class

Plaintiffs move to certify the following class:

All persons who purchased Tidel common stock on the open market during the period from January 14, 2000 through February 8, 2001 inclusive, (the "Class Period") who were damaged by the defendants' alleged violations of Section 10 and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and/or Rule 10b–5 promulgated thereunder, or Section 20A of the Exchange Act. Excluded are the defendants, members of the immediate family of the Individual Defendants (Rash, Levenick, Britton, and Clay), any entities in which any defendant has a controlling interest, and the legal representatives, heirs,

successors, predecessors in interest, affiliates or assigns of any defendant.

The class period begins on January 14, 2000, the date Tidel announced a purchase order placed by CCC for its new Chameleon ATM, and ends on February 8, 2001, the date Tidel issued a press release announcing financial results for the quarter ending December 31, 2000 and the loss of CCC's business to NCR.

## III. Defendants' Opposition to Class Certification

Overall, Defendants argue that class certification is inappropriate because Plaintiffs cannot establish that: (1) questions of law and fact common to the class predominate over individual questions of law and fact, (2) the proposed representatives' claims are typical of the claims of the class, (3) the proposed representatives will fairly and adequately protect the interests of the class, or (4) that the class action procedure is superior to other available methods for trial.

With respect to predominance, Defendants argue that Plaintiffs cannot show that a class-wide presumption of reliance applies in this case and predominates over individual reliance issues. Defendants also allege Plaintiffs failed to address the fraud-on-the-market doctrine in their motion for class certification; therefore, Plaintiffs are precluded from raising the issue at all. Furthermore, Defendants argue that Plaintiffs' invocation of the rebuttable presumption applicable to omissions cases per *Affiliated Ute* is improper because this case is not primarily

---

**4.** Section 10(b) prohibits an individual from using the mail, interstate commerce, or any national securities exchange to use or employ any manipulative or deceptive device in contravention of the SEC rules and regulations in connection with the purchase or sale of any registered or unregistered security. 15 U.S.C. § 78j(b) (2000). The SEC Rules and Regulations set forth the proscribed conduct in Section 10(b) in more detail. Specifically, Rule 10b–5 states that it is unlawful to: (1) employ any device, scheme, or artifice to defraud, (2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit

upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5 (2003).

**5.** Section 20(a) imposes joint and several liability for persons that control defendants that violate the Exchange Act. 15 U.S.C. § 78t(a) (2000); *Jensen v. Snellings*, 841 F.2d 600, 610 (5th Cir. 1988).

**6.** Section 20A creates a private cause of action against a corporate insider by investors who contemporaneously bought or sold securities at or about the same time as the insider. 15 U.S.C. § 78t–1(a) (2000); *In re Enron Corp.*, 235 F.Supp.2d 549, 595 n. 34 (S.D.Tex.2002).

an omissions action. *See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) (finding a presumption of reliance in a failure to disclose fraud action). Instead, Defendants contend that Plaintiffs' chief complaints surround public, material misrepresentations. Therefore, Defendants argue the *Affiliated Ute* presumption is inapplicable to this action.

Next, Defendants assert that the two proposed class representatives, Keeler and Stauffer, are atypical because they are subject to a variety of unique defenses that will become the focus of trial. Specifically, Defendants assert that Keeler lacks standing to bring claims under section 20A of the Exchange Act because he did not trade contemporaneously with any insider defendant. Defendants also allege that Keeler is atypical because he purchased Tidel stock after learning that the company's Chameleon ATM allegedly suffered from technical problems. Likewise, Defendants argue that Stauffer is atypical because he continued to purchase Tidel stock after Tidel announced that CCC was in negotiations with NCR. Furthermore, Defendants argue that Stauffer relied on direct, nonpublic communications with Tidel management in making his investment decisions.

Defendants also contend Lead Plaintiffs are inadequate as class representatives because they have little personal knowledge concerning the procedural status and history of the case, names of their counsel, anticipated costs of the lawsuit, and progress of discovery and settlement.

Finally, Defendants argue Plaintiffs failed to show that a class action is superior to other available methods of fair and efficient adjudication. Moreover, Defendants assert that Plaintiffs' failed to show the existence of a negative value suit, which is they argue is the most compelling rationale for finding superiority.

## IV. *Class Certification Under Rule 23*

To attain certification of the proposed class, Plaintiffs must meet each of the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy. *Vizena v. Union Pac. R.R. Co.,* 360 F.3d 496, 502 (5th Cir.2004); *Stirman v. Exxon Corp.,* 280 F.3d 554, 558–59 (5th Cir.2002); FED. R. CIV. P. 23(a)(1–4). Because Plaintiffs seek to certify the class under Rule 23(b)(3), they must also show that common issues predominate and that class treatment is the superior method to resolve the dispute. *See* FED. R. CIV. P. 23(b)(3).

Plaintiffs bear the burden of proof on class certification. *Berger v. Compaq Computer Corp.,* 257 F.3d 475, 482 (5th Cir. 2001); *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 740 (5th Cir.1996). For purposes of a class certification motion, the substantive allegations contained in the complaint must be accepted as true. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Longden v. Sunderman,* 123 F.R.D. 547, 551 (N.D.Tex.1988). The district court may certify a class only if a "rigorous analysis" convinces it that all conditions set out in Rule 23 are met. *Castano,* 84 F.3d at 740. In so doing, the court must consider "how a trial on the merits would be conducted" if a class were certified. *Id.* A district court may look past the pleadings to determine if Rule 23's requirements have been met. *Id.* at 744. This necessitates looking "beyond the pleadings ... [to] understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Id.* However, for certification purposes, a plaintiff is not required to prove that it will prevail on its claims. *Id.* (indicating the strength of a plaintiff's claims should not affect the certification decision).

### A. *Rule 23(a) Requirements*

#### 1. *Numerosity*

In this case, Defendants concede numerosity for the section 10(b)/Rule 10b–5 and section 20(a) claims, but not for Plaintiffs' section 20A claim. Thus, to satisfy the numerosity requirement, the court must inquire whether the class is so numerous that joinder of all members is impracticable. *See Watson v. Shell Oil Co.,* 979 F.2d 1014, 1022 (5th Cir.1992); *see also* FED. R. CIV. P. 23(a)(1). Only shareholders who traded contemporaneously with the selling defendants

have standing to assert a section 20A claim. In order to raise a section 20A claim, plaintiffs must plead a separate violation of the Exchange Act. *See In re Enron Corp.*, 235 F.Supp.2d at 595 n. 34. Thus, the scope of this proposed class is narrower than the proposed class for the section 10(b) and 20(a) claims. However, a plaintiff need not demonstrate with precision the number of persons in the class to satisfy the requirement that joinder is impracticable where such a conclusion is clear from reasonable estimates. *Henry v. Cash Today, Inc.*, 199 F.R.D. 566, 569 (S.D.Tex.2000); *see also Zeidman v. J. Ray McDermott Co.*, 651 F.2d 1030, 1038 (5th Cir.1981).

■ The Fifth Circuit favors the presumption that "any class composed of the sellers of a nationally traded security during a period in which hundreds of thousands or even millions of shares of the security were traded must necessarily be 'so numerous that joinder of all members is impracticable.'" *Zeidman*, 651 F.2d at 1039. Further, it is well-settled that subclasses are only necessary when "a class [is] divided between" conflicting claimants or divergent elements of proof "requir[ing a] division into homogenous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999).

■ Here, as of September 30, 2000, Tidel's Form 10–K showed Tidel had 8,500 shareholders of record. Further, Tidel was nationally traded on the NASDAQ market during the class period and had approximately 17,426,210 shares of common stock outstanding as of August 20, 2001.[7] While Plaintiffs have not provided evidence concerning how many contemporaneous traders exist, the Court relies on the sheer number of shareholders alone, which indicates joinder of all class members is impracticable.[8] Likewise, the possible geographic diversity among potential plaintiffs weighs heavily in favor of class treatment. *See, e.g., Mertz v. Harris*, 497 F.Supp. 1134, 1138 (S.D.Tex. 1980) (stating "the geographic diversity of the proposed class greatly reduces the importance of determining the class certification issue on the basis of sheer numbers"). Additionally, Plaintiffs assert that no section 20A subclass is needed because section 10(b)/ Rule 10b–5 and 20A contain overlapping elements, which may be proved by the same alleged material omissions and scienter. Plaintiffs further represent that section 20A claimants can be easily distinguished for damages purposes because those individuals will obtain compensation from disgorged profits. Based on the number of overall shareholders, the Court agrees with Plaintiffs and is convinced that the class members asserting section 20A claims will be sufficiently large. Thus, Plaintiffs have satisfied the numerosity requirement for all of their claims.

### 2. *Commonality*

■ "The threshold of 'commonality' is not high." *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 296–97 (5th Cir.2001) (citing *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir.1986)). A common question is one that, when answered as to one class member, "will affect all or a significant number of the putative class members." *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir.1993). Because Defendants concede commonality, the Court need not analyze whether there are questions of law or fact common to the class.[9] FED. R. CIV. P. 23(a)(2).

---

7. The National Association of Securities Dealers Automated Quotations ("NASDAQ") is an electronic stock market, listing approximately 3,600 companies. *See* About NASDAQ, *available at* http:// www.nasdaq.com/about/aboutNasdaq_0104/about/index.html.

8. *See Greenwald v. Integrated Energy, Inc.*, 102 F.R.D. 65, 68 (S.D.Tex.1984) (finding the numerosity requirement satisfied where investors of the

company traded millions of shares during the class period).

9. Nevertheless, the Court notes the following examples of the numerous common issues of fact and law: (a) whether Defendants made material misrepresentations and/or omissions; (b) whether Defendants acted with scienter; (c) whether Defendants' conduct caused artificial inflation of the market price of Tidel stock; and (d) the

### 3. *Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "Like commonality, the test for typicality is not demanding." *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 625 (5th Cir.1999). Typicality exists when the claims of named and unnamed plaintiffs have a common source and rest upon the same legal and remedial theories. *Id.* Typicality does not mean that the claims of the representative parties be identical to those of the absent members. *See Phillips v. Joint Legislative Comm. on Performance & Expenditure Review,* 637 F.2d 1014, 1024 (5th Cir.1981). Rather, typicality may be satisfied where the representative plaintiffs' claims arise out of the same event or course of conduct as the other members' claims and are based on the same legal theory. *See Ligon v. Frito–Lay, Inc.,* 82 F.R.D. 42, 47 (N.D.Tex.1979) (finding "a class representative and a class member must be similarly, not identically, situated"). Factual differences will not defeat typicality. *Stirman,* 280 F.3d at 562. The typicality requirement protects class members from representation by a party who is "preoccupied" with a defense which is only applicable to himself. *Warren v. Reserve Fund, Inc.,* 728 F.2d 741, 747 (5th Cir.1984). Thus, class certification is not appropriate where a class representative is subject to unique defenses that threaten to become the focus of the litigation. *See Zachery v. Texaco Exploration & Prod., Inc.,* 185 F.R.D. 230, 240 (W.D.Tex.1999).

Here, Lead Plaintiffs argue that they stand in the same position as other potential class members because they purchased Tidel common stock during the class period at artificially inflated prices and were injured because of Defendants' omissions and misrepresentations. Plaintiffs also argue typicality exists because all class members invested in Tidel. *See Rubenstein v. Collins,* 162 F.R.D. 534, 538 (S.D.Tex.1995) (stating proposed class representatives' claims are typical because they invested in [the company] just as the potential class members did"). The proposed class asserts multiple violations of federal securities laws, including sections 10(b), 20(a), and 20A of the Exchange Act. For purposes of Plaintiffs' claims, the alleged injuries to the class members have a common source: the alleged misrepresentations and omissions of Tidel directors to the investing public.

In contrast, Defendants challenge Lead Plaintiffs' typicality. First, Defendants assert that Keeler is an atypical plaintiff because he lacks standing to sue under section 20A of the Exchange Act for failing to trade contemporaneously with any defendant. To have standing to sue under section 20A, a plaintiff must trade contemporaneously with an insider defendant, meaning a plaintiff must have traded on either the same day or within two to three days of the insider. *See In re Enron Corp. Sec. Litig.,* 258 F.Supp.2d 576, 600 (S.D.Tex.2003); *In re AST Research Sec. Litig.,* 887 F.Supp. 231, 234 (C.D.Cal. 1995). Likewise, Defendants argue a plaintiff must have standing to serve as a class representative. *Kase v. Salomon Smith Barney,* 218 F.R.D. 149, 159 n. 13 (S.D.Tex. 2003).

In response, Plaintiffs argue that typicality is only destroyed where a unique defense threatens to become the *focus of the litigation. See In re Enron Corp. Sec. Litig.,* 206 F.R.D. 427, 456 (S.D.Tex.2002) (emphasis added). Plaintiffs state that Keeler does have standing because he did purchase contemporaneously with the insider Defendants through his wife's trust account, the Marie Keeler Revenue Trust.[10] Additionally, Plaintiffs argue that, even if Keeler did not purchase contemporaneously with an insider Defendant, Stouffer did, and Keeler's purported lack of standing would not become a focus of the litigation.

amount, if any, of the artificial inflation of Tidel stock.

**10.** *See Medline Indus. Employee Profit Sharing and Retirement Trust v. Blunt, Ellis & Loewi, Inc.,* No. 89 C 4851, 1993 WL 13436 at *2–3 (N.D.Ill. Jan.20, 1993) (rejecting defendants' summary judgment argument that plaintiff lacked standing to sue under Rule 10b–5 because stock was purchased with plaintiff's husband's funds).

For typicality, the key inquiry is whether a class representative would be required to devote considerable time to rebut the Defendants' claim. *See In re Enron Corp. Sec. Litig.*, 206 F.R.D. at 456 (finding proposed representative atypical where it would be required to devote considerable time to rebut the Defendants' claim). Thus, the Court must inquire whether Keeler would be required to devote a large amount of his time to rebut the Defendants' claim that he lacks standing to maintain a section 20A claim.

The Court determines that Keeler's claims, and the defenses potentially applicable to him, are typical of the class. Keeler likely has standing to sue because "purchasers" should be "interpreted broadly to include ... the parties who make investment decisions." *Alfan v. Caprock Comm. Corp.*, No. 3:00–CV–1613–R, 2000 U.S. Dist. LEXIS 21743 at *7–10 (N.D.Tex.2000); *EZRA Charitable Trust v. Rent–Way, Inc.*, 136 F.Supp.2d 435, 441–42 (W.D.Pa.2001) (finding one with unrestricted decision-making authority to be a "purchaser" with standing to sue under federal securities laws). Keeler made all the investment decisions for the Marie Keeler Trust, which purchased contemporaneously with the insider Defendants. Moreover, even if Keeler did not have standing to assert a section 20A claim, it would not render him atypical because it would not present a conflict between him and the class. Also, Keeler would want to prosecute the 20A claims on behalf of his wife, whom he purchased for. Regardless of Keeler's standing, the section 20A claims will continue to be prosecuted because Stauffer has standing to bring them. The Court is unable to identify any argument arising from Keeler's purported lack of standing which would become the focus of the litigation. Thus, Defendants' argument that Keeler is atypical because he allegedly lacks standing to bring a section 20A claim fails.

As a second attack on Plaintiffs' typicality, Defendants argue both Keeler and Stauffer are not typical because they did not rely on Defendants' omissions. Defendants argue the *Affiliated Ute* presumption is rebuttable. *Banca Cremi, S.A. v. Alex Brown & Sons,*

*Inc.,* 132 F.3d 1017, 1036 (4th Cir.1997). Defendants assert that if the Plaintiffs' conduct would have been the same even with full disclosure, then they are subject to the unique defense of no reliance because Defendants' failure to disclose cannot be the cause of their loss. *Lipton v. Documation, Inc.,* 734 F.2d 740, 742 (11th Cir.1984); *Shores v. Sklar,* 647 F.2d 462, 468 (5th Cir.1981).

Specifically, Defendants argue Plaintiffs' claims are based on two theories of fraud: (1) Tidel's announcement of CCC's purchase order for Chameleon ATM's was false and misleading because the Chameleon had technical problems; and (2) Tidel misrepresented its "good relationship" with CCC because it failed to disclose that CCC was in negotiations with NCR to replace Tidel as its primary supplier. Using these two theories, Defendants assert that Stauffer was not concerned with the Chameleon's alleged technical problems because he continued to purchase stock based on his assumption that the problems could be worked out. Defendants also assert that Stauffer conceded receipt of Tidel's press release acknowledging that NCR was trying to take away Tidel's role as CCC's main supplier. Defendants argue this negates Stauffer and Keeler's reliance on Tidel's alleged misrepresentations as both Plaintiffs continued to purchase stock.

However, Plaintiffs refute Defendants' assertions that Keeler and Stauffer did not rely on the Defendants' misrepresentations. Plaintiffs argue that Defendants repeatedly corrected and reissued misrepresentations to assure investors that its had a healthy financial status. Specifically, Plaintiffs assert that Defendants' disclosures were partial negative disclosures, which Defendants thereafter falsely discounted or denied. Plaintiffs represent that courts have repeatedly ruled purchases after partial negative announcements during or after the class period do not destroy typicality. *See Steiner v. Southmark Corp.,* 734 F.Supp. 269, 276 (N.D.Tex.1990) (holding that plaintiffs were entitled to presumption of reliance where partial disclosures allegedly tainted market's view of defendant company's worth). Furthermore, courts have ruled that purchases of stock by the class representatives after negative an-

nouncements during the class period or even after the close of the class period do not destroy typicality. *In re FirstPlus Fin. Group, Inc.*, 2002 WL 31415951, at *6 (N.D.Tex.2002) (indicating vast majority of courts hold that a plaintiff's purchase of stock after the close of a class period or after disclosure of materially adverse information does not raise a unique defense to destroy typicality); *Del Dietrich v. Bauer*, 192 F.R.D. 119, 125 (S.D.N.Y.2000) (finding proposed class representative typical despite continuing to purchase after wide dissemination of negative publicity).

Again, the key typicality inquiry is whether a class representative would be required to devote considerable time to rebut Defendants' claims. *See In re Enron Corp. Sec. Litig.*, 206 F.R.D. at 456. In the captioned matter, Defendants' assertion that Stauffer and Keeler's lack of reliance on Defendants' alleged misrepresentations would require considerable time to rebut, but the Court believes the defense of lack of reliance upon Defendants' disclosures can be made against all class members. Stauffer and Keeler are not unique in this regard. Additionally, this argument goes to the merits of the case, and the Court declines to delve more deeply into the merits at the class certification stage.

▮ Furthermore, purchases after partial curative disclosures do not necessarily render a proposed class representative atypical. *See Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 609–10 (S.D.Ohio 2003); *see also Feinberg v. Hibernia Corp.*, 1992 WL 176119, at *6–7 (E.D.La.1992) (certifying class and proposed representative where no conflict existed between early and late purchasers and market continued to be defrauded after partial curative disclosure); *Katz v. Comdisco, Inc.*, 117 F.R.D. 403, 411 (N.D.Ill.1987) (stating "[w]hen a named plaintiff alleges a common course of conduct in a securities class action, the fact that he purchased late in the

class period does not vitiate his suitability as a class representative"); *In re Consumers Power Co. Sec. Litig.*, 105 F.R.D. 583, 608 (E.D.Mich.1985) (indicating that a late purchaser was not rendered atypical based on that fact alone because "[l]ate purchasers have a special incentive to prove the case of the earlier purchases"). Based on the foregoing, the Court determines that Stauffer and Keeler are not atypical based on their alleged non-reliance on Defendants' disclosures and/or late purchases of Tidel stock.

### 4. *Adequacy*

Defendants do not challenge the adequacy of Plaintiffs' counsel. Therefore, the Court will only investigate whether the adequacy of Plaintiffs' class representatives has been fairly demonstrated.[11]

▮ Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The class representatives' interests must be aligned with, and not antagonistic to, unnamed class members. *Mullen*, 186 F.3d at 625–26. A sufficient alignment of interests exists when "all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir.1981); *Bertulli*, 242 F.3d at 298 n. 33 (adequacy was present when class representatives did not seek relief at the expense of unnamed class members).

▮ The adequacy requirement requires an inquiry into: "(1) the zeal and competence of the representative[s'] counsel and . . . (2) the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees." *See Berger*, 257 F.3d at 484. "[As] long as all class members are united in asserting a common right, such as

---

11. The district court must also find that the lawyers who will be responsible for trying the case are competent to pursue the action. *See, e.g., In re Workers' Comp.*, 130 F.R.D. 99, 107 (D.Minn. 1990); *see also Roper v. Consurve, Inc.*, 578 F.2d 1106, 1112 (5th Cir.1978). In this case, Lead Plaintiffs' counsel for the proposed class is Schoengold & Sporn, P.C. Liaison counsel is Claxton & Hill, PLLC. Plaintiffs' Executive Committee is comprised of Stull, Stull & Brody and Cauley, Geller, Bowman & Coates, LLP. These lawyers have extensive experience and expertise in class action litigation and securities litigation. Defendants have conceded that Plaintiffs' counsel meets the requirement, and the Court agrees.

achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes." *In re Corrugated Container Antitrust Litig.*, 643 F.2d at 208.

█ Defendants allege that Lead Plaintiffs are merely figurehead plaintiffs and are not taking an active role in leading and controlling the litigation. Defendants state that a primary concern of the Private Securities Litigation Reform Act is Congress' desire to eliminate figurehead plaintiffs who exercise little or no supervision of the litigation. *See, e.g., In re Advanced Tissue Sci. Sec. Litig.*, 184 F.R.D. 346, 352 (S.D.Cal.1998) (stating "[t]he very purpose of the [Reform Act] was to curtail the influence of professional, figurehead plaintiffs by transferring primary control of the private securities litigation from lawyers to investors"). Furthermore, Defendants argue that if the court is uncertain regarding the adequacy of the class representatives, then it should deny class certification on that ground. *See Berger*, 257 F.3d at 483 (indicating that the PSLRA requires "that securities class actions be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation"). Defendants contend that Keeler and Stauffer's deposition testimony demonstrates that they have abdicated their duties to class counsel.[12]

In contrast, Plaintiffs respond that Defendants' arguments against Lead Plaintiffs' adequacy are deficient. Only one meeting occurred concerning settlement, and it was fruitless. Furthermore, both Lead Plaintiffs understand they must approve any settlement offers in this litigation. Additionally, the majority of Stauffer and Keeler's interactions have been with the firm of Schoengold & Sporn as its sole lead counsel, and communications with non-lead counsel are not required. With respect to costs, at the time of

Lead Plaintiffs' depositions, no major costs had been incurred because the action had been stayed for approximately fourteen months. Finally, the absence of a fee agreement lends no weight to Lead Plaintiffs' inadequacy.

Instead, Plaintiffs argue that both Keeler and Stauffer are the ideal type of Lead Plaintiff for securities litigation. Plaintiffs are both highly educated, have owned and operated personal businesses, each relied on public information while investing in Tidel stock, and, as a result, each suffered large economic losses.[13] Both Lead Plaintiffs indicate that they have a steadfast commitment to this action, have reviewed court papers prior to filing, studies and absorbed the detailed allegations in the complaints, and demonstrated a clear understanding of their duties as Lead Plaintiffs. Likewise, class representatives are not required to have a complete knowledge of the case. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 62 (2d Cir.2000); *see also In re FirstPlus Fin. Group, Inc.*, 2002 WL 31415951 at *7. Despite that requirement, Lead Plaintiffs Stauffer and Keeler attended the entire three day class certification hearing, testified in person regarding production of documents, answering interrogatories, selecting skilled legal counsel, and conferring with their attorneys about the prosecution of this action.[14] Furthermore, both Lead Plaintiffs testimony at the class certification hearing evidenced that these individuals have an understanding of the facts of the case, the legal claims being asserted, and their responsibilities as proposed class representatives.

Based on this Court's review of the deposition transcripts and the class certification hearing testimony of Stauffer and Keeler, the Court determines that these individuals meet the adequacy requirement of Rule 23(a) and

---

12. For example, Defendants point to various deposition excerpts to show that Keeler and Stauffer have never met one another, neither knew about potential settlement negotiations or had discussed settlement possibilities with their counsel, both Plaintiffs could not identify all of the law firms representing them in this action, counsel does not send them billing statements, they do not control billing costs, and they have no fee agreement with counsel.

13. Plaintiffs indicate that Stauffer suffered approximately $1 million in losses related to his investment in Tidel Technologies, Inc., and Keeler lost approximately $414,041.

14. Unlike the proposed representatives in *Kase*, Plaintiffs have shown an inclination to take an active role in monitoring class counsel's activities. *Kase*, 218 F.R.D. at 159.

will vigorously prosecute this action as Lead Plaintiffs.

Given the foregoing, the Court determines that Plaintiffs have met their initial burden of establishing the Rule 23(a) requirements for class certification. The Court thus turns to the question of whether the class is maintainable pursuant to Rule 23(b)(3).

### B. *Rule 23(b)(3)*

Rule 23(b)(3) provides that a class action may be maintained if the Rule 23(a) factors are met and "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3). The issues to be considered under Rule 23(b)(3) are referred to as "predominance" and "superiority." *See Henry*, 199 F.R.D. at 570.

#### 1. *Predominance/Causation*

■ In determining whether legal issues common to the class predominate over individual issues, the Court must inquire how the case will be tried. *Castano*, 84 F.3d at 740. This entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class. *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir.2003).

■ The predominance and superiority requirements are "far more demanding" than is Rule 23(a)(2)'s commonality requirement. *Amchem Prods. v. Windsor*, 521 U.S. 591, 624, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). In making this determination, the district court must consider variations in state law and must also address how a trial on the merits would be conducted. *Castano*, 84 F.3d at 740. Rule 23(b)(3) does not require all questions of law or fact be common; it only requires that the common questions predominate over individual questions. *Longden*, 123 F.R.D. at 556. In deciding whether this requirement is met, courts focus on issues relating to the defendants' liability.

*See id.* If the liabilities are common to the class, common questions are held to predominate over individual questions. *See Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N.Y.1981); *see also Longden*, 123 F.R.D. at 556.

■ "Rule 23 is a remedial rule which should be construed liberally to permit class actions, especially in the context of securities fraud suits, where the class action device can prove effective in deterring illegal activity." *Longden*, 123 F.R.D. at 551. Typically, "predominance is readily met in certain cases alleging consumer or securities fraud." *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231. However, in securities fraud litigation concerning section 10(b)/Rule 10b–5, section 20(a), and section 20A, the Plaintiffs must demonstrate that individual issues of reliance will not predominate. *See, e.g., Basic v. Levinson*, 485 U.S. 224, 241–47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (discussing, in detail, the applicability of the fraud-on-the-market theory and a rebuttable presumption of reliance in a Rule 10b–5 setting); *Affiliated Ute*, 406 U.S. at 153–54, 92 S.Ct. 1456 (presuming reliance in fraud action where defendants failed to disclose material information); *Fine v. Am. Solar King Corp.*, 919 F.2d 290, 299 (5th Cir.1990). "[A] fraud class action cannot be certified when individual reliance will be an issue." *Castano*, 84 F.3d at 745.

■ The key issue regarding predominance is whether plaintiffs are entitled to a presumption of reliance applicable to all class members. *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 303 (S.D.Tex.2000). The fraud-on-the-market presumption of reliance "is only available when a plaintiff demonstrates that a defendant made fraudulent misrepresentations or omissions concerning a security that is actively traded in an 'efficient market,' thereby establishing a 'fraud on the market.'" *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir.1999) (citing *Basic*, 485 U.S. at 241–42, 108 S.Ct. 978); *O'Neil v. Appel*, 165 F.R.D. 479, 498 (W.D.Mich.1996); *Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D.Tex.2001); *GK Intelligent*, 196 F.R.D. at 303–04 (indicating that Plaintiff bears the burden of proof on showing that the market was efficient throughout the class period).

Whether a company's stock traded in an efficient market is a complex issue that requires an analysis of numerous factors, including: (1) how quickly new information about the company is reflected in the stock price; (2) the stock's trading volume; (3) analyst coverage; (4) market maker activity; and (5) eligibility to file a Securities Exchange Commission ("SEC") Form S–3 registration statement. *Krogman,* 202 F.R.D. at 477.[15] Federal courts typically look to expert testimony to decide this issue. *See, e.g., Krogman,* 202 F.R.D. at 477; *O'Neil,* 165 F.R.D. at 484. Furthermore, Defendants may rebut this presumption by "[a]ny showing" that severs the link between the alleged misrepresentation and the price. *Basic,* 485 U.S. at 248, 108 S.Ct. 978.

Initially, Defendants contend that Plaintiffs have not properly invoked the fraud-on-the-market presumption because they did not provide expert testimony or mention fraud-on-the-market theory, as well as its elements, in their motion for class certification. As support, Defendants cite to *Young v. Nationwide Life Insurance Company,* 183 F.R.D. 502, 510 (S.D.Tex.1998), to support the proposition that Plaintiffs cannot wait until their class certification reply brief to attempt to satisfy their burden of proof on the applicability of a presumption of reliance. Alternatively, Defendants argue that, even if Plaintiffs are allowed to raise the fraud-on-the-market presumption, it fails and/or Defendants' can rebut the presumption.[16]

In contrast, Plaintiffs contend that they generally argued that the presumption of reliance exists in this case and cited to the basic authorities regarding the fraud-on-the-market presumption of reliance in their class certification motion. Furthermore, expert testimony is not "necessary or needed" at the class certification stage to determine market efficiency. *Unger v. Amedisys, Inc.,* Civ. No. 01–703, at *2 n. 3; *16–17 (M.D.La. Aug. 1, 2003).

The Court notes that Defendants are correct in that Plaintiff did not specifically set out each element of the fraud-on-the-market test in its motion for class certification. However, this Court finds that broad statements indicating that Plaintiffs relied, discussing related factual issues that make up the fraud-on-the-market doctrine, and referencing caselaw specifically discussing the fraud-on-the-market presumption of reliance is enough to put Defendants on notice that Plaintiffs intended to rely upon this theory. Furthermore, Plaintiffs indicated their intent to rely on the fraud-on-the-market theory prior to the class certification hearing, and Defendants deposed Plaintiffs' expert regarding fraud-on-the-market prior to the class certification hearing. Thus, the Court finds that Plaintiffs properly raised the fraud-on-the-market theory, and Defendants will not suffer prejudice by allowing Plaintiffs to proceed on this issue.

▮▮▮▮ In briefing and at the class certification hearing, Plaintiffs contend that the requisite factors for the fraud-on-the-market presumption weigh in favor of class certification. In order to utilize a fraud-on-the-market presumption, there must be a finding that the securities traded in an efficient market. *Cammer v. Bloom,* 711 F.Supp. 1264, 1286–87 (D.N.J.1989); *Krogman,* 202 F.R.D. at 477. A market is efficient when investors, using public information, engage in sufficient competition to move the price of a security from one level to another as new information reaches the marketplace. In an efficient market, price changes occur very quickly and unbiasedly because there is adequate competition between investors in the marketplace for superior opportunities.

---

15. The fact that a company's stock is listed on a national exchange does not establish that it trades in an efficient market. *See O'Neil,* 165 F.R.D. at 504 (stating "the issue is not whether NASDAQ is efficient." Instead, the "[i]nquiry ... remains on the market for that stock, and not the location where the stock trades. No court has ever held that a finding of efficiency can be based on the mere fact that a stock is traded on NASDAQ ...").

16. At this stage of the proceedings, the Court need only inquire whether the stock traded in an efficient market and not examine the merits of the case. *See Cheney v. Cyberguard Corp.,* 213 F.R.D. 484, 496 (S.D.Fla.2003) (indicating courts should not delve into the merits of a case at the class certification stage). Thus, the Court will not address whether Defendants' can rebut the presumption of reliance.

At the hearing, the Court accepted and evaluated the testimony of both parties' experts regarding market efficiency.[17] Courts have looked to various factors to determine whether stock traded in an efficient market. *Cammer*, 711 F.Supp. at 1286–87. Courts do not necessarily give the factors equal weight when determining market efficiency. *See id.* Thus, in light of the experts' testimony, the parties' arguments at the class hearing, and parties' briefing, the Court will address each factor in turn.[18]

### a. *Incorporating New Information*

Whether stock evidences immediate integration is one of the factors to be considered. *Cammer*, 711 F.Supp. at 1286–87. A stock that reacts immediately to a public disclosure trades in an efficient market. *See id.* at 1286. More importantly, the cause and effect relationship between new information and stock price movement is "the essence of an efficient market and the foundation for the fraud on the market theory." *Id.* at 1287. Thus, the key inquiry in determining whether Tidel stock traded in an efficient market is whether a cause and effect relationship exists between company-specific news and stock price movement. *Krogman*, 202 F.R.D. at 477; *Binder*, 184 F.3d at 1065.

Plaintiffs state that a general review of the effect of Tidel's corporate news on common stock price shows that news was immediately integrated into the market. For example, on February 8, 2001, Tidel announced its potential loss of CCC business, and the stock price plunged 45% from $5.31 per share to $2.91 per share.

Additionally, both parties presented expert testimony, in the form of sophisticated statistical tests, to determine the issue. Both experts agreed that to isolate the cause and effect relationship between company-specific news and stock price movement, the statistical analysis must account for market and industry forces.

Professor Pettit, Plaintiffs' expert, conducted an event study using Tidel's trading data. He identified two-day periods in which information pertaining to Tidel was released to the public and separated those two days from other two day periods in which there was no public information pertaining to Tidel.[19] The periods were classified into "information" versus "non-information days." Both experts analyzed the price changes on the "information days" and the "non-information days" and compared the results of the two groups. Professor Pettit concluded that the price changes on information days versus non-information days was statistically significant, meaning there was a related cause and effect relationship between the release of information pertaining to Tidel and Tidel's stock price. Simply put, Professor Pettit's tests indicated that Tidel's stock price reacted within a two-day window to news releases concerning Tidel, which indicates market efficiency. Separately, Professor Pettit also conducted a regression analysis event study using the NASDAQ index to eliminate overall market effects, and the results also indicated market efficiency.

Additionally, Professor Pettit performed a serial correlation test, which is a statistical examination of the sequence of prices of Tidel common stock during the class period that tests for market efficiency by looking for trends in stock pricing.[20] In an efficient market, there should be no trends because the market should be reacting quickly to new information, and new prices are being set quickly based upon the new information. Thus, if there is a serial correlation in the

**17.** Plaintiffs' expert, Professor Pettit, was in favor of a finding of market efficiency, while Defendants' expert, Professor Magee, argued the Tidel market was inefficient.

**18.** The Court notes that Tidel's stock did not trade on the NASDAQ national market until August 15, 2000. Prior to this date, it traded on the NASDAQ small cap market. In any event, the fact that a company's stock is listed on a national exchange does not establish that it trades in an efficient market. *O'Neil*, 165 F.R.D. at 504.

**19.** Both experts agreed that the use of such two-day periods and segregation of those two day periods into "information days" and "non-information days" was appropriate.

**20.** Both parties' experts agreed that a serial correlation test is an accepted test for determining market efficiency.

stock prices, it lends to a finding of market inefficiency. Professor Pettit's testing indicated a serial correlation of—.02, which is a strong, highly statistically significant indication that the market for Tidel common stock was efficient during the class period.

In contrast to Plaintiffs' expert, Defendants' expert, Professor Magee, ran various analyses to determine whether market efficiency existed. Professor Magee conducted a regression analysis for 51 news events as Indicator 1, which initially showed market inefficiency. However, Magee later adjusted his calculation in Indicator 1 and conceded that this test pointed toward market efficiency instead. Magee stated Indicator 1 was a "mixed indicator," but later conceded a finding of efficiency.

Professor Magee's next test run, Indicator 2, was similar to Indicator 1, but he controlled for the NASDAQ and NASDAQ computer index. Indicator 2 looked at whether the stock price changes on information days were different from other days. Indicator 2 suggested a finding of market inefficiency. However, Professor Magee conceded that Indicator 2's regression analysis was flawed because the assembly of data, combining positive and negative returns, artificially skewed results towards a finding of market inefficiency. Thus, Indicator 2 is biased towards Defendants.

Next, like Professor Pettit's serial correlation test, Professor Magee ran a variance ratio test as Indicator 3. Indicator 3 looked at stock changes on information days versus non-information days. His variance ratio test looks for a random walk. The results of Magee's variance ratio test indicated inefficiency in the Tidel common stock market during the class period. However, Plaintiffs' expert argued that Magee's test in Indicator 3 was inherently biased towards inefficiency because the variance changes and does not remain constant over the test run. Professor Pettit demonstrated that using Magee's set up for Indicator 3 would result in a finding of market inefficiency for well-established stocks like Microsoft, Oracle, and Intel. Ul-

timately, Professor Magee agreed that Indicator 3 would contain an inherent bias towards inefficiency.

Finally, Professor Magee's testing in Indicator 4 resulted in a finding of market inefficiency. Indicator 4 was a regression analysis on Tidel common stock during the class period using the NASDAQ and NASDAQ computer indexes. This test looks for a cause and effect relationship between Tidel information and stock price movement. Therefore, Magee isolated the market price changes in Tidel stock, net of overall market movements, on 51 information days, which he identified using subjective criteria. Professor Magee analyzed the net price changes on those 51 days using a 95% confidence interval, which showed that 5 of the 51 information days reflected price changes that were statistically significant. Those five days included January 31, 2000, September 19, 2000, October 19, 2000, December 18, 2000, and February 8, 2001. Magee concluded that the market was efficient on these five days.[21] However, Plaintiffs' argued that if the confidence interval used by Professor Magee was reduced, the number of days with significant price changes would only increase. In fact, Plaintiffs pointed to fourteen information days with price changes of 10% or more when using a 78% confidence interval.

Overall, Professor Magee's analyses conclude that 90% of the time there is no cause and effect relationship between new information and stock price movements. In sharp contrast, Professor Pettit concluded that there is a statistically significant cause and effect relationship between disseminated information and market price. The Court is not required to determine which of the two experts' opinion is correct at this stage of the proceedings. Thus, having considered the applicable authorities, evidence, and the parties' expert testimony, the Court concludes that the evidence presented is sufficient to demonstrate, for class certification purposes, that a cause and effect relationship between company-specific announcements and stock price may exist. Plaintiffs have adequately

**21.** The Court finds it important to note that news regarding Tidel reached the marketplace on several of the dates where Defendants' expert concluded the market was efficient, such as September 19, 2000, October 19, 2000, December 18, 2000, and February 8, 2001.

demonstrated that Tidel stock price may have been affected by company-specific news during the class period.

### b. *Trading Volume*

■ Another factor is the average weekly trading volume expressed as a percentage of total outstanding shares. *Cammer*, 711 F.Supp. at 1286–87. Courts have specifically found that there is a substantial presumption of an efficient market if the securities' average weekly trading volume is 1% or more of the total outstanding shares and an even greater presumption of market efficiency if the percentage is 2%. *Krogman*, 202 F.R.D. at 474; *Unger v. Amedisys, Inc.*, Civ. No. 01–703, at *15–16 (M.D.La. Aug. 1, 2003); *Cammer*, 711 F.Supp. at 1277.

The Plaintiffs' expert, Professor Pettit, explained that substantial trading volume indicates investor interest, competition between investors, and the extent to which investors are digesting information and establishing new prices, which all equate to market efficiency. Here, both parties' experts agreed that Tidel's average weekly trading volume was 10%, which is considered high trading volume.[22] Additionally, Professor Pettit opined that the 10% trading volume clearly indicates a strong presumption of market efficiency. However, Defendants' expert indicated that much of this trading volume could be attributed to noise traders.[23] Even if some of the volume could be attributed to noise traders, the Court determines that 10% is far above the 1% that provides a presumption of market efficiency. Thus, the Court determines that this factor weighs in favor of a finding of market efficiency.

### c. *Analyst Coverage*

The existence of analyst coverage is yet another consideration. *Cammer*, 711

F.Supp. at 1286–87. The greater the number of securities analysts that cover a security, the more likely that investors rely on disseminated information. *Id.* at 1285–87.

In this case, both parties recognized that three isolated analyst reports were issued concerning Tidel stock, and there were no analysts following the security that resulted in the frequent publication of analyst reports. However, Professor Pettit proffered that four analysts covered Tidel stock during the class period, and Tidel's stock was impacted by that analyst ; coverage. For example, when the WAB analyst report was issued, Tidel's stock price rose about 15%. Professor Pettit also noted the existence and level of institutional investors and their holdings during the class period. Pettit stated there is a general understanding that a high level of institutional interest in a security serves to increase the efficiency of the market. Based on this information, the Court determines that the level of analyst coverage is relatively neutral in terms of finding market efficiency.

### d. *Market Maker Activity*

■ The existence and number of market makers is also pertinent to the court's determination of market efficiency. *Cammer*, 711 F.Supp. at 1286–87. The presence of a large number of market makers from sizable firms suggests market efficiency.[24]

At the class certification hearing, Professor Pettit noted that there were twenty to twenty-five market makers for Tidel stock during the class period, of which four or five were active at any given time. He further testified that the existence of four or five market makers is generally sufficient to assure that there is competition and investor access to the marketplace that would be consistent with market efficiency.[25] Plaintiffs

---

**22.** Tidel stock traded at approximately 348,000 shares/day, slightly below the NASDAQ average of 363,000 shares/day. Professor Pettit indicated Tidel's average weekly trading volume was 1.7 million shares/week. There were 17–18 million Tidel shares issued and outstanding during the class period.

**23.** Noise traders are uninformed traders who trade frequently, like day traders, trying to generate a profit from the high volatility of a stock.

**24.** A market maker is a firm that makes a market in a particular security by maintaining bid and ask prices and standing ready to buy or sell at these publicly-quoted prices.

**25.** Further, Pettit explains that market makers who have substantial capital tends to further enhance market efficiency. Here, there were at least two market makers with substantial capital, Smith Barney and Prudential.

also supplemented the class certification hearing record with information indicating that sixteen market makers were listed on Tidel's NASDAQ national market application for public securities.[26]

In sharp contrast, Defendants contend there were no market makers in Tidel stock. Defendants assert that the only evidence raised about the number of market makers is an estimate by Tidel's Director of Investor Relations, Leonard Carr, who testified that there were four to five active market makers, but none were major brokerage firms. Defendants argue that even four to five market makers is far below the number of market makers sufficient to demonstrate market efficiency. *Cammer*, 711 F.Supp. at 1283 n. 30 (finding this factor sufficient where stock had eleven active market makers); *Krogman*, 202 F.R.D. at 476 (finding it insufficient where thirty market makers existed, but only six to ten exercised a strong interest).

The Court notes that over the entire class period there were twenty to twenty-five market makers in Tidel stock. Further, Defendants' corporate representative testified that four to five were active in Tidel stock, but none were major brokerage firms. However, Defendants' own NASDAQ national market application for public securities indicated that sixteen market makers were in existence, including some large, well-capitalized brokerage firms. Based on prior caselaw, the Court determines that this factor is seemingly neutral, if not tipping towards a finding of market efficiency.

### e. *Eligibility to file a SEC Form S-3 Registration Statement*

Whether the company has sufficient market "float," the number of outstanding shares excluding shares held by insiders and affiliates multiplied by the then current market price, to permit filing of an S-3 Registration Statement is also taken into consideration when determining market efficiency. *Cammer*, 711 F.Supp. at 1286–87. Only corporations whose stock is actively traded and widely followed are allowed to use Form S-3.[27] In this case, the float threshold was $75,000,000. Plaintiffs adequately demonstrated that the "float" requirement was met for a majority of the class period.[28] However, both parties concede that Tidel was not eligible to file an S-3 throughout the class period because it did not always maintain sufficient market capitalization.[29] Thus, this factor appears to be inconclusive to the Court.

To summarize, Plaintiffs adequately demonstrated that there is a cause and effect relationship between company-specific news and Tidel stock price to favor a finding of market efficiency. Tidel's trading volume also weighs in favor of a finding of market efficiency. However, analyst coverage is considered to be neutral as far as market efficiency is concerned. Market maker activity is also relatively neutral, if not slightly weighing in favor of market efficiency. Finally, eligibility to file a S-3 is considered inconclusive. Thus, weighing all of the factors involved, the Court concludes that Plaintiffs have shown the market to be efficient and are entitled to a fraud-on-the-market presumption in this case.

■■■ Independent of the fraud-on-the-market presumption, Plaintiffs also seek a presumption of reliance under *Affiliated Ute* based upon material omissions. *Affiliated Ute*, 406 U.S. at 153–54, 92 S.Ct. 1456. However, Defendants assert that Plaintiffs are not entitled to an *Affiliated Ute* presumption of reliance with respect to their section 20A claim because that presumption is applicable only to omissions and not affirmative misrepresentations. *Id.* "[T]he *Affiliated Ute* presumption of reliance is not warranted in a Rule 10b–5 case when the plaintiff alleges both nondisclosures and positive misrepresentations instead of only nondisclosures as in *Affiliated Ute.*" *Kirkpatrick v. J.C. Brad-*

---

26. The sixteen market makers include several large, well-capitalized firms such as Southwest Securities, Inc. and Schwab Capital Markets.

27. Form S-3 is a shorter prospectus that is reserved for companies that meet the $75,000,000 market capitalization requirement and that filed

SEC reports for twelve consecutive months. 17 C.F.R. § 239.13 (2003).

28. See Plaintiffs' Exhibit 9.

29. A float of $75,000,000 or more was present for 219 of the 270 day class period.

*ford & Co.*, 827 F.2d 718, 722 (11th Cir.1987). In short, Defendants contend the *Affiliated Ute* presumption does not apply to cases like this one because it involves affirmative misstatements of fact, not omissions. *Steiner*, 734 F.Supp. at 275–76 (indicating *Affiliated Ute* presumption inapposite where "[p]laintiffs' primary contention is that defendants created a distortion of [the company's] financial condition through a series of overly optimistic and/or incomplete financial statements, press releases, and statements").

However, Plaintiffs argue that their section 20A claim rests entirely on omissions—where Defendants "stood mute" while they sold their stock in the face of a legal duty to either disclose the material adverse information they knew or refrain from insider trading-and *Affiliated Ute* is applicable. Plaintiffs assert that "all that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making his investment decision." *Affiliated Ute*, 406 U.S. at 153–54, 92 S.Ct. 1456.

The Court agrees with Defendants that Plaintiffs are unable to utilize an *Affiliated Ute* presumption in context with their section 10(b), 20(a), and 20A claims. Plaintiffs claims do not involve primarily omissions, but affirmative misrepresentations. Thus, the Court determines that Plaintiffs may not rely on the *Affiliated Ute* presumption of reliance in this mixed context. *Steiner*, 734 F.Supp. at 275–76.

### 2. *Superiority*

█ Rule 23(b)(3) also requires that the court determine whether a class action is superior to other possible methods of fairly and efficiently resolving this controversy. FED. R. CIV. P. 23(b)(3). Plaintiffs argue that courts have consistently recognized the utility and necessity of Rule 23 class actions to remedy violations of federal securities laws. *See, e.g., Blackie v. Barrack*, 524 F.2d 891, 903 (9th Cir.1975); *King v. Kansas City S. Indus., Inc.*, 519 F.2d 20, 25–26 (7th Cir. 1975).

In response, Defendants assert that recent Fifth Circuit precedent disfavors class certification because it "skews trial outcomes and 'creates insurmountable pressure on defendants to settle, whereas individual trials would not.'" *Griffin*, 196 F.R.D. at 305 (citing *Castano*, 84 F.3d at 746). Defendants also argue that this is not a negative value suit; therefore, the court should deny class certification. *Castano*, 84 F.3d at 748.[30]

Factors the court should consider in makings its determination whether a class action is superior include the interest of members of the class in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the difficulties likely to be encountered in the management of a class action. FED. R. CIV. P. 23(b)(3)(A-D).

The first factor, the interest of class members to control litigation individually, matters mainly when absent class members have personal injury claims. *See Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir.1996), *aff'd sub nom., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). When only economic losses are at issue, the interest to personally control the litigation is small. As long as the named plaintiffs seek to maximize the recovery for the class, little else matters. Here, Lead Plaintiffs' interest in individually controlling the prosecution of this action is minimal. Thus, the Court turns to the remaining factors.

The second factor relates to the pendency of other litigation. As far as the Court is aware, there is no other litigation currently pending, which weighs in favor of class certification. The parties did not provide any contradictory information. As for the third factor, desirability of concentrating litigation in this forum, Lead Plaintiffs have shown a desire to focus litigation in this Court because all actions were consolidated in this Court. Furthermore, the value of concen-

---

**30.** A negative value suit is one in which the stakes to each member are too slight to repay the cost of the suit. *GK Intelligent*, 196 F.R.D. at 305 n. 6.

trating litigation in this forum is great as this Court has already made several rulings in this case thus far. Accordingly, the second and third factors weigh in favor of finding a class action superior to other methods of adjudication.

The fourth factor addresses the difficulties likely to be encountered in the management of a class action. Plaintiffs argue that class action treatment is superior to individual actions because individual actions would waste judicial resources and leave most class members without an economically feasible remedy. Plaintiffs contend that this case is easily manageable as a class action because the class is clearly defined and can be notified without undue difficulty. Plaintiffs represent that counsel can manage the case efficiently, with minimal burden on the Court.

Defendants argue Plaintiffs failed to show that a class action is superior to other available methods of fair and efficient adjudication. Moreover, Defendants assert that Plaintiffs' failed to show the existence of a negative value suit, which is they argue is the most compelling rationale for finding superiority.

The Court disagrees with Defendants' contention that this is not a negative value suit. There are likely many smaller purchasers of Tidel stock who would be unable to pursue their claims outside of a class action. Furthermore, in the instant case, it would be impracticable for the individual shareholders of Tidel Technologies, Inc. to bring individual lawsuits concerning Defendants' conduct during the class period.[31] The class size is sufficient for certification. There is no need to create any sub-classes in this litigation. The issues are solely ones of federal law. There are no novel legal theories to be pursued by the parties. Accordingly, the Court determines that a class action would be the superior method to proceed in this litigation.

## V. *Conclusion*

In closing, the Court is of the opinion that a class action-rather than innumerable individual actions-is the better method of litigating this dispute. Therefore, the Court deter-

mines that the motion for class certification should be granted. Given the foregoing, the Court hereby

ORDERS that Lead Plaintiffs' Motion for Class Certification of a class consisting of:

All persons who purchased Tidel common stock on the open market during the period from January 14, 2000 through February 8, 2001 inclusive, (the "Class Period") who were damaged by the defendants' alleged violations of Section 10 and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and/or Rule 10b–5 promulgated thereunder, or Section 20A of the Exchange Act. Excluded are the defendants, members of the immediate family of the Individual Defendants (Rash, Levenick, Britton, and Clay), any entities in which any defendant has a controlling interest, and the legal representatives, heirs, successors, predecessors in interest, affiliates or assigns of any defendant

is GRANTED.

---

**31.** During the class period, there were approximately 8,500 shareholders of record.